Timothy J. Mulreany
Chief Trial Attorney
tmulreany@cftc.gov
Maryland Bar No.: 8812160123
Attorney for Plaintiff
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, DC
(202) 418-5306

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>JAFX, LTD. aka JAFX, EOOD,<br><br>　　　　　　Defendant. | Case No.: 2:18-cv-00598<br><br>COMPLAINT FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND OTHER ANCILLARY AND EQUITABLE RELIEF |

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

## I.   SUMMARY

1. Beginning in at least September 2016 and continuing to the present (the "relevant period"), JAFX, Ltd. aka JAFX, EOOD ("JAFX" or "Defendant"), an offshore company claiming to operate from St. Vincent and the Grenadines and Bulgaria, using the website *http://www.JAFX.com* ("website") and videos on *http://www.YouTube.com* ("YouTube"), is, or has offered to be, the counterparty to leveraged, retail foreign currency ("forex") transactions for customers located in the United States who are not Eligible Contract Participants ("ECPs"),

-1-

without being registered with the Commission as a retail foreign exchange dealer ("RFED"), in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Commodity Exchange Act ("Act or CEA"), 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2012), and Commission Regulation ("Regulation") 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2017).

2. Throughout the relevant period, each time JAFX opened an account for a retail forex customer to engage in retail forex transactions, it failed to provide each retail forex customer with a written "Risk Disclosure Statement," in violation of Regulation 5.5, 17 C.F.R. § 5.5 (2017).

3. By virtue of this conduct and the further conduct described herein, JAFX has engaged, is engaging, or is about to engage in acts and practices in violation of the Act, 7 U.S.C. §§ 1-26 (2012), and the Regulations, 17 C.F.R. pts. 1-190 (2017).

4. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and 7 U.S.C. § 2(c)(2)(C), the Commission brings this action to enjoin JAFX's unlawful acts and practices and to compel its compliance with the Act and the Regulations and to further enjoin JAFX from engaging in certain commodity or forex-related activity, including soliciting or accepting orders from U.S. customers and offering to be the counterparty to customers' forex transactions without appropriate registration with the Commission and opening accounts without the required disclosure statements.

5. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

6. Unless restrained and enjoined by this Court, JAFX likely will continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.   JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), provides that the Commission may bring actions for injunctive relief or enforce compliance with the Act in the proper district court of the United States whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

8. The Commission also has jurisdiction over the conduct and transactions at issue in this case pursuant to Sections 2(c)(2)(C) of the Act, 7 U.S.C. §§ 2(c)(2)(C) (2012).

9. Venue properly lies with the Court pursuant to 7 U.S.C. § 13a-1(e) because JAFX transacts business in this District and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

## III.   PARTIES

10. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations.

11. Defendant **JAFX, Ltd. aka JAFX EOOD**, is a Bulgarian company licensed to do business in St. Vincent and the Grenadines. It uses as a business address The Financial Services Centre, Stoney Ground, Kingstown, St. Vincent and the Grenadines, and also purports to have a business address in Bulgaria at Sofia 1463, Triaditsa District, Prestige Business Center, 49 Patriarch Evtimii, 4th floor, Bulgaria. JAFX has never been registered with the Commission in any capacity.

## IV.  STATUTORY BACKGROUND

12. Section 2(c)(2)(C)(iii)(I)(aa) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2012), prohibits any person, unless registered with the Commission in such capacity as the Commission by rule, regulation, or order shall determine, from soliciting and accepting from retail customers orders for transactions in forex offered on a leveraged or margined basis that do not result in actual delivery and do not create an enforceable obligation to deliver between a seller and a buyer who have the ability to deliver and accept delivery.

13. The Act defines an ECP, in relevant part, as an individual with total assets in excess of: (i) $10 million, or (ii) $5 million and who enters the transaction "to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." CEA §1a(18)(xi), 7 U.S.C. § 1a(18)(xi). Individuals who do not meet these criteria are non-ECPs. JAFX's customers are typically non-ECPs—i.e., retail customers.

14. The Regulations define an RFED, in relevant part, as any person that is, or offers to be, the counterparty to a retail forex transaction. Regulation 5.1(h)(1), 17 C.F.R. § 5.1(h)(1) (2017).

15.     The Regulations define a retail forex transaction as any account, agreement, contract or transaction described in 7 U.S.C. § 2(c)(2)(B), or § 2(c)(2)(C). 17 C.F.R. § 5.1(m). A retail forex transaction does not include an account, agreement, contract or transaction in forex that is a contract of sale of a commodity for future delivery (or an option thereon) that is executed, traded on or otherwise subject to the rules of a contract market designated pursuant to Section 5(a) of the Act, 7 U.S.C. § 5(a) (2012). *Id.*

## V.     FACTS

### A.     JAFX's Operations

16.     JAFX solicits orders from U.S. customers who are not ECPs to open leveraged, retail forex trading accounts through JAFX's website as well as videos on YouTube, where JAFX is, or offers to be, the counterparty to each leveraged, retail forex transaction. Customers are directed to open trading accounts by submitting an online account application through JAFX's website. JAFX encourages customers to access and trade their accounts via a mobile application ("app"), stating on the JAFX website: "Clients are able to access all trading tools on the go with our iOS/Android mobile trading app. Trade anywhere and anytime." While the website contains language noting that the solicitations are "not directed at U.S. customers," there is nothing in the online account application stating JAFX does not accept U.S. customers, nor are U.S. customers prevented from opening accounts. The application process contains a drop-down menu of companies from which JAFX accepts customers; the first country listed is the "United States." U.S. customers may open an account with JAFX with as little as $100 USD.

17.     JAFX's online account application does not seek any information about prospective customers' ability to send or receive actual delivery of forex or customers' business

need for forex. JAFX's online account application does not inquire as to whether a prospective customer is an ECP or about a prospective customer's savings and investments. The online account application does not inquire if a prospective customer has assets in excess of $5 million, nor does it inquire if the prospective customer is seeking to trade forex to manage the risk of an asset or liability already owned, or about to be owned, by the prospective customer.

18.   During the relevant period, JAFX solicited and accepted funds and orders from non-ECP, U.S. resident customers to trade leveraged forex contracts, for which JAFX acted as the counterparty to each retail forex transaction. While JAFX's website states, in part: "All information on this website is not directed towards soliciting citizens or residents of the United States and the United Kingdom," this is nothing more than a poor attempt to evade U.S. regulatory requirements. That JAFX actively seeks U.S. customers is demonstrated by other aspects of its website which provides a "U.S. toll free number," and the fact that it has accepted thousands of applications from U.S. customers. In addition, the "frequently asked questions" or FAQ section of the website does not list the U.S. under the section titled: "What countries are restricted from using JAFX."

19.   In addition, nowhere on JAFX's online application does it solicit information concerning whether prospective customers are ECPs, and it fails to inquire whether a prospective customer has the ability or the business need to accept foreign currency into his or her bank account. In the FAQ portion its website, JAFX advises customers:

> Once your documents are fully verified it is time to fund your landing account. A JAFX landing account is where you can store funds before you distribute them into your trading accounts. Funds in the landing account cannot be traded unless you move them to a trading account.

20. JAFX permits U.S. and international customers to fund forex trading accounts using wire transfer, Skrill,[1] credit/debit cards, and/or Bitcoin. To create a trading account, prospective customers are directed to "click on the 'My Accounts' tab in the JAFX Portal and click on 'Add USD Account'." Moreover, the default setting for JAFX's funding trading accounts is United States dollars ("USD").

21. Once a customer has funded a trading account, JAFX allows customers to link their trading account to as many accounts traded by third-party account managers as the customer desires:

> Once you have successfully deposited into your 'Landing Account'
> you will eligible to create as many managed accounts as you wish.
> A JAFX managed account will give you the ability to follow JAFX
> Third Parties. You will need to create a separate Managed
> Account for each EA or third party that you wish to follow giving
> you the ability to spread your funds across programs.

22. JAFX's online account application does not require that the customer state whether or not the customer has the ability to deliver and accept delivery in connection with the customer's lines of business, which is one of the prerequisites to qualify as an ECP. In fact, with leveraged, retail forex accounts being offered for as little as $100 USD, JAFX is specifically soliciting customers that typically could never qualify as ECPs.

23. JAFX neither advises actual and prospective U.S. customers in its solicitations to that JAFX is required to be registered with the Commission as an RFED, nor does JAFX advise actual and prospective customers that it is acting unlawfully by operating as a RFED in the U.S. without such registration. In the FAQ section of the website, JAFX appears to acknowledge its

---

[1] An online payment and money transfer service offering, *inter alia*, international money transfers. *See* www.skrill.com.

unlawful conduct by stating: "JAFX is currently not regulated. Regulation takes a very long time to setup and we are in the process of applying for regulation." As of the date of the filing of this Complaint, JAFX has not filed for registration with the Commission.

24. JAFX determines the maximum and minimum trade size for all trades it offers to customers, and determines the amount of leverage it offers customers. JAFX advises its customers in the FAQ section of its website that: "The minimum trade size is 0.01 Lot" and "The maximum trade size of (sic) 1,000 Lots." JAFX further advises customers under the FAQ section of its website titled, "What is the maximum leverage JAFX offers?," that the maximum leverage JAFX offers clients is 1:500. This means that a customer can increase its trading position by buying or selling up to 500 times the amount of funds the customer invested. Thus, for example, a JAFX customer may trade up to $500,000 notional value in foreign currencies with a $1,000 deposit, and a customer with $10,000 invested may trade up to $5,000,000 in foreign currencies. This high degree of leverage means that even a small price movement can produce large losses in relation to the customer's initial deposit and can result in customers rapidly losing their funds and being unable to ever recover from a losing trade.

25. JAFX's forex contracts neither result in delivery within two days nor create an enforceable obligation to deliver between a seller and a buyer who have the ability to deliver and accept delivery, respectively, in connection with their lines of business. Rather, these forex contracts are ultimately offset without anyone making or taking delivery of actual currency (or facing an obligation to do so).

26. Each of the retail forex transactions offered by JAFX are the type of accounts, agreements, contracts or transactions described in Section 2(c)(2)(B) or 2(c)(2)(C) of the Act,

7 U.S.C. § 2(c)(2)(B), (C) (2012). None of the transactions in forex offered by JAFX is a contract of sale of a commodity for future delivery (or an option thereon) that is executed, traded on or otherwise subject to the rules of a contract market designated pursuant to Section 5(a) of the Act, 7 U.S.C. § 5(a) (2012). Therefore, each transaction offered by JAFX is a retail forex transaction.

27. JAFX's "terms and conditions," which are set forth in its website, further confirms that JAFX agrees to act as an RFED by agreeing to "provide services to Customer in connection with the purchase and sale of over-the counter margin based [forex] trading contracts" and by noting that "Customer hereby acknowledges and agrees that JAFX may act as the counterparty to Customer for any trade entered for the undersigned's Account." Thus, JAFX is an RFED, and has been acting as an RFED, because it is, and has offered to be, the counterparty to U.S. customers' retail forex transactions.

28. JAFX is not exempt from the requirement to register with the Commission as an RFED.

**B.    Mandatory Disclosure Statement to Retail Forex Customers**

29. Regulation 5.5, 17 C.F.R. § 5.5 (2017), prohibits RFEDs from opening a retail forex account unless they first furnish customers with a written disclosure statement that provides certain mandated information specified in 17 C.F.R. § 5.5 concerning forex trading and receive back from the customer a signed acknowledgment that the customer received and understood the disclosure statement.

30. At no time during the relevant period has JAFX provided this disclosure statement to its U.S. retail forex customers.

## VI.  STATUTORY AND REGULATORY VIOLATIONS

### COUNT ONE

**Operating as an Unregistered Foreign Exchange Dealer in
VIOLATION OF SECTION 2(c)(2)(C)(iii)(I)(aa) OF THE ACT, 7 U.S.C.
§ 2(c)(2)(C)(iii)(I)(aa) (2012), AND REGULATION 5.3(a)(6)(i),
17 C.F.R. § 5.3(a)(6)(i) (2017)**

31.  The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein.

32.  Section 2(c)(2)(C)(iii)(I)(aa) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2012), prohibits any person or entity from soliciting or accepting from non-ECPs orders for leveraged or margined forex transactions if such person or entity is not registered in such capacity as the Commission shall determine.

33.  Pursuant to Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2017), persons or entities who offer to be or are the counterparty to leveraged or margined forex transactions with U.S. customers who are non-ECPs, are required to be registered with the Commission as retail foreign exchange dealers.

34.  Throughout the relevant period, JAFX solicited or accepted orders from U.S. resident non-ECPs in connection with leveraged or margined forex transactions and is or offers to be the counterparty to the forex transactions.  JAFX engages in this conduct without being registered as an RFED.  By this conduct, JAFX is violating 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(i).

35.  Each day that JAFX engaged in this conduct since at least September 1, 2016, to the present is alleged as a separate and distinct violation of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6)(i).

## COUNT TWO

### Failure To Provide Disclosure Statement in
### VIOLATION OF COMMISSION REGULATION 5.5, 17 C.F.R. § 5.5 (2017)

36.     The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein.

37.     Regulation 5.5, 17 C.F.R. § 5.5 (2017), prohibits RFEDs from opening any forex account for retail customer unless the RFED first provides the customer with a written disclosure statement that includes the following information:

      (a)     for each of the most recent four calendar quarters during which the counterparty maintained retail forex acounts:

            (i)     the total number of non-discretionary retail forex customer accounts maintained by the retail foreign exchange dealer;

            (ii)    the percentage of accounts that were profitable during the equarter; and

            (iii)   the percentage of such accounts that were not profitable during the quarter.

      (b)     a Risk Disclosure Statement warning of the financial losses that can inccur using leverage, conflicts of interests and other risks.  Specifically, RFEDs must disclose in writing, in all capital letters, that:

            (i)     the RFED's trading is not on a regulated market or exchange and customers' funds have no regulatory protection;

            (ii)    because of leverage and other risks, customers can rapidly lose all of their funds;

            (iii)   the RFED, if serving as the counterparty, has a direct financial conflict of interest with the customer because when the customer loses money trading, the counterparty dealer is making money on such trades;

            (iv)    the RFED may commingle customers' funds with its own operating funds or use them for other purposes; and

    (v)  in the event that the RFED becomes bankrupt, funds the dealer is holding for customers, in addition to funds owed to customers whether or not any assets are maintained in separate deposit accounts by the dealer, may be treated as an unsecured creditor's claim.

  38.  17 C.F.R. § 5.5 also requires that the RFED receives back from the retail forex customer a signed and dated acknowledgement that the customer received and understood the disclosure statement.

  39.  JAFX did not provide its U.S. retail forex customers with a disclosure statement that comports with these requirements. Therefore, JAFX violated, and continues to violate 17 C.F.R. § 5.5, each time it accepts a U.S. customer.

  40.  Each retail forex account that JAFX opened during the Relevant Period without providing customers with a written disclosure statement that includes the information required by 17 C.F.R. § 5.5 is alleged as a separate and distinct violation of 17 C.F.R. § 5.5.

## VII.

## RELIEF REQUESTED

  **WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

  **A.**  A finding that Defendant violated Section 2(c)(2)(C)(iii)(I)(aa) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) (2012), and Regulations 5.3(a)(6)(i) and 5.5, 17 C.F.R. §§ 5.3(a)(6)(i), 5.5 (2017);

  **B.**  An order of permanent injunction enjoining Defendant and any other person or entity associated with it, including but not limited to affiliates, agents, servants, employees,

assigns, attorneys and all persons in active concert or participation with Defendant, including any successor thereof, from:

 i. Engaging, directly or indirectly, in conduct in violation of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa, and 17 C.F.R. §§ 5.3(a)(6)(i), 5.5 (2017);

 ii. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

 iii. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2017, as amended by 83 Fed. Reg. 7979, 7980 (Feb. 23, 2018)), for their own personal account(s) or for any account in which Defendants have a direct or indirect interest;

 iv. Having any commodity interests traded on Defendant's behalf;

 v. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

 vi. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

 vii. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and/or

   **viii.**  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration, or required to be registered with the Commission (except as provided for in 17 C.F.R. § 4.14(a)(9) (2017));

 **C.** An order directing Defendant to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2018), for each violation of the Act and Regulations, as described herein;

 **D.** An order directing Defendant, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

 **E.** An order directing Defendant, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer and investor whose funds Defendant received, or caused another person or entity to receive, as a result of the acts and practices constituting violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

**F.**     An order directing Defendant, as well as any successors thereof, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between, with, or among Defendant and any customer or investor whose funds were received by Defendant as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

**G.**     An order directing that Defendant, and any successors thereof, make an accounting to the Court of all of its assets and liabilities, together with all funds it received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind during the relevant period to the date of such accounting;

**H.**     An order requiring Defendant and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and,

**I.**     An order providing such other and further relief as the Court deems proper.

Dated: __July 27__, 2018               Respectfully submitted,
                                        COMMODITY FUTURES TRADING
                                        COMMISSION
                                        /s/ Timothy J. Mulreany
                                        Timothy J. Mulreany
                                        Chief Trial Attorney
                                        Maryland Bar No.: 8812160123
                                        tmulreany@cftc.gov
                                        Attorney for Plaintiff
                                        Commodity Futures Trading Commission
                                        1155 21st Street, N.W.
                                        Washington, DC
                                        (202) 418-5306
                                        (202) 418-5538 (fax)